UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| NEW CINGULAR WIRELESS PCS LLC, <br> d/b/a AT&T MOBILITY, | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | No. _____ |
| vs. | ) <br> ) <br> ) | |
| CITY OF LIBERAL, KANSAS and CITY COMMISSION OF THE CITY OF LIBERAL, KANSAS, | ) <br> ) <br> ) <br> ) | |
| Defendants. | ) | |

# COMPLAINT

This action arises out of the unlawful denial by the City Commission of the City of Liberal, Kansas of a wireless communications facility siting request by Plaintiff New Cingular Wireless PCS LLC d/b/a AT&T Mobility ("AT&T"). For its Complaint, AT&T alleges as follows:

1. The Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.* (the "Telecommunications Act" or the "1996 Act") preempts state and local decisions that "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B). The City of Liberal, Kansas ("City") and the City Commission of the City of Liberal, Kansas ("Commission") violated § 332(c)(7)(B) when they denied AT&T's application (the "Application") for permission to construct an approximately 150-foot wireless communication monopole (the "Facility") and related equipment to be located on the Liberal Country Club golf course (the "Site") because the Commission's denial has the effect of prohibiting AT&T's provision of wireless services in the area.

2. AT&T seeks to install the Facility at the Site to remedy significant service deficiencies in its personal wireless service coverage in the area. AT&T considered several

potential locations for the proposed Facility, but each of the alternatives proved infeasible or impermissible based on the Commission's ordinance interpretations and application denials, including one site for which AT&T previously applied for a special use permit and was denied by the Commission. AT&T's proposal to place a monopole at the Site is the only feasible option for and least intrusive means of filling the significant gap in coverage in the area.

## THE PARTIES

3. Plaintiff New Cingular Wireless PCS LLC d/b/a AT&T Mobility is a Delaware limited liability company. It is licensed to conduct business in the State of Kansas and operates wireless communications facilities throughout the State of Kansas. New Cingular Wireless PCS LLC is indirectly wholly owned by AT&T Inc., subsidiaries and affiliates which provide wireless communication services nationwide.

4. Defendant City of Liberal, Kansas is a duly incorporated first class city located in Seward County, Kansas.

5. Defendant City Commission of the City of Liberal, Kansas is a duly constituted city commission established under the laws of the State of Kansas with an office at 324 North Kansas Avenue, Liberal, KS 67901.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to (a) section 332(c)(7)(B)(v) of the Telecommunications Act because AT&T has been adversely affected and aggrieved by the Zoning Board's denial of its Application and (b) 28 U.S.C. § 1331 because this action presents a federal question under the Telecommunications Act.

7.      This Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over AT&T's claims made pursuant to Kansas law because those state law claims are so related to the federal claims as to form part of the same case or controversy.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside in this district and the events and/or omissions giving rise to AT&T's claims arose in this judicial district.

## FACTS

### I. Background

9.      AT&T and its affiliates provide wireless voice and data products and services to customers nationwide, including "personal wireless services" within the meaning of Section 332 of the Telecommunications Act, 47 U.S.C. § 332.

10.     The licenses authorizing AT&T to provide wireless service in the City were issued by the FCC pursuant to the Federal Communications Act, as amended. The Act establishes a national policy to "make available, so far as possible, to all people of the United States, without discrimination . . . a rapid, efficient, Nation-wide and worldwide wire and radio communications service with adequate facilities at reasonable charges for the purposes of national defense [and] for the purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151.

11.     Wireless service is important to the public safety and for consumer convenience. There are now more wireless subscriptions than landline telephone subscriptions in the United States. At present, the number of landline telephone subscribers across the nation is declining every year while the number of wireless subscribers increases.

12. For many Americans, wireless devices have become an indispensable replacement for traditional landline telephones. Even when Americans maintain both types of service, they are opting increasingly to use wireless over their landline.

13. For Americans living in "wireless only" homes and working in "wireless only" businesses, cell phones are their only lifeline in emergencies.

14. To meet the policy goals established by Congress, and provide personal wireless services to local businesses, public safety entities, and the general public, AT&T must consistently update its technology, facilities, and network to keep up to date with customers' ever-growing demand for mobile services, including mobile data service, wireless phone coverage, and emergency services communications. Among other things, AT&T must create and maintain a network of "cell sites," each of which consists of antennas and related equipment designed to send and receive radio signals.

15. Wireless devices using all-digital technology operate by transmitting a radio signal to antennas mounted on a tower, pole, building, or other structure. The antennas feed the signals to electronic devices housed in a small equipment cabin or base station. The base station is connected by microwave, fiber optic cable, or ordinary telephone wire to a base station controller subsequently routing the calls throughout the world.

16. In order to provide reliable service to a user, coverage must overlap in a grid pattern resembling a honeycomb. For the entire network to be operational, there must be properly placed cell sites installed and functioning so that reliable coverage can be realized. Only when the entire system is operational will a user have service and be able to partake in uninterrupted conversations throughout a given territory. If there is no functioning cell site within a given area, there would

be no service for customers within that area and mobile customers who travel through the area will experience an unacceptable level of dropped calls.

17. When there is a need to improve coverage in a specific area, AT&T's engineers produce a search ring, identifying the area within which a wireless facility of the necessary height must be located or upgraded. The study takes into account the topography of the land, the coverage boundaries of neighboring cells, and other factors.

## II. AT&T's Coverage Gap and Site Search

18. AT&T has significant service deficiencies in its wireless network coverage in the City of Liberal. Specifically, AT&T's coverage in the area around the proposed Site is stressed and is causing service disruptions for local customers. Due to the continued population and commercial growth in the area, the coverage issues will only get worse over time.

19. The Site of AT&T's proposed Facility is located in a populated and well-traveled area on the northwest side of the City.

20. Placing the proposed Facility, a 150-foot monopole, at the proposed Site would alleviate the issues currently experienced and to be experienced with respect to AT&T's wireless coverage. The Site is centrally located within the area in question.

21. AT&T considered several alternatives to the Site, including nearby properties. The area that AT&T seeks to serve is primarily residential. AT&T was unable to identify any commercially zoned properties and zero industrially zoned properties located in the area where AT&T could place facilities to remedy its gap in coverage.

22. The search for an acceptable alternative site included researching any existing tall structures (buildings, other towers, water towers) near the proposed location.

23. When attempting to remedy a gap in service coverage, AT&T seeks where possible to co-locate its antenna facilities on existing towers or other existing suitable structures.

24. Here, there is no existing tower or other tall structure upon which AT&T could co-locate its facilities to remedy the service deficiencies.

25. The Site has been used for commercial purposes for over one hundred (100) years, and AT&T's proposed use would be consistent with that underlying use.

### III. AT&T's Previous Zoning Application

26. As part of its search for an appropriate site, AT&T previously filed an application for a special use permit to construct a monopole facility at New Beginnings Church, 2021 N. Western Ave., (the "Church Site") in 2021.

27. A monopole facility at the Church Site would have remedied the service deficiencies AT&T seeks to remedy in the instant case.

28. AT&T's Church Site application was denied by the Commission in 2021 due to local resident opposition.

29. After the denial, City officials suggested AT&T consider the Site at the Country Club, as the City would view it more favorably.

### IV. AT&T's Zoning Application

30. AT&T's site acquisition representative submitted a Zoning Application for the Facility on June 24. 2022. AT&T's application satisfied the Zoning Code's submission requirements and demonstrated that the Facility would address the substantial service issues in the area immediately surrounding the Facility.

31. AT&T's proposed Facility would not have any negative noise, glare, or odor effects on adjoining properties, and it would not require lighting.

32. On September 8, 2022, the City of Liberal Board of Zoning Appeals approved AT&T's application for a special use permit, finding that it fulfilled the necessary conditions for special use.

33. On October 11, 2022, the Commission held a public hearing on AT&T's Application, but tabled a decision on the Site.

34. On October 25, 2022, the Commission voted to deny AT&T's Application, finding that "'it [the special use permit] is against our building codes' and 'there's no proof that we permitted a Special Use Permit to put up a tower so it's not within our rules.'" See Exhibit A.

35. The Zoning Administrator, Keith Bridenstine, wrote in an October 26, 2022, letter to AT&T's agent that the intent of the City's zoning regulations is that no tower be placed into a residentially zoned area. Attached as Exhibit A is a true and correct copy of the Mr. Bridenstine's October 26, 2022, letter.

36. Mr. Bridenstine's letter also cites a City zoning ordinance stating, "towers shall be permitted in any I-1, I-2, or I-2A industrial districts," while also conceding that "there are cell towers located in various places throughout the City in zoned commercial areas."

37. In subsequent discussions with City officials, AT&T understood that the City viewed its ordinances as only permitting cellular communications facilities in industrially zoned areas.

**COUNT I**
**(The Federal Telecommunications Act of 1996,**
**47 U.S.C. § 332(c)(7) - Effective Prohibition)**

38. AT&T incorporates by reference the allegations in each of the paragraphs set forth above.

7

39. Although the 1996 Act preserves local zoning authority over the siting of wireless facilities, 47 U.S.C. § 332(c)(7)(A), "the method by which siting decisions are made is now subject to judicial oversight." *Cellular Tel. Co. v. Town of Oyster Bay,* 166 F.3d 490, 493 (2d Cir. 1999). "Therefore, denials subject to the Act are reviewed by a court more closely" than other zoning decisions. *Id*. Among other things, "[i]f a decision is not supported by substantial evidence, § 332(c)(7)(B)(iii), or if it effectively prohibits the provision of wireless service, § 332(c)(7)(B)(i)(II), then under the Supremacy Clause of the Constitution, local law is pre-empted in order to effectuate the Act's national policy goals." *Second Generation Props. L.P. v. Town of Pelham*, 313 F.3d 620, 627 (1st Cir. 2002).

40. Local authority over zoning and land use matters cannot be used to "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

41. The Telecommunications Act requires local zoning authorities to allow carriers to resolve significant coverage issues in the coverage of their wireless networks.

42. AT&T has a significant gap in reliable wireless coverage in the area surrounding the Site, including populated neighborhoods and well-traveled roads.

43. AT&T's proposed Facility at the Site represents the only feasible and least intrusive means of remedying AT&T's significant gap in its personal wireless services coverage.

44. The City's denial has effectively prohibited the provision of personal wireless services within the meaning of Section 332(c)(7)(B)(i).

45. The City's zoning ordinances, as interpreted by the City, effectively prohibit the provision of personal wireless services insofar as the City has concluded that towers are not

8

allowed in zoned-residential areas or commercial areas, which accounts for all feasible locations within AT&T's search ring.

46. The City's failure to comply with the Telecommunications Act has caused and will continue to cause AT&T irreparable harm.

47. AT&T is entitled to relief under the Telecommunications Act ordering the Zoning Board to approve AT&T's approval and to provide permits required to install, operate, and maintain the Facility.

## COUNT II
## REQUEST FOR JUDICIAL REVIEW OF ZONING DECISION

48. AT&T incorporates by reference the allegations in each of the paragraphs set forth above.

49. The City's interpretation of the Zoning Code and related actions and decisions described herein improperly prohibit AT&T from proceeding with installation of the Facility at the Site.

50. The City lacks a reasonable basis for denying AT&T's Application, in violation of K.S.A. 66-2019(h)(1)(C), in that it is unreasonable to interpret the City's zoning ordinance to mean that towers are only allowed in zoned-industrial areas, which are limited in number and only located on the outskirts of the City.

51. AT&T has exhausted all available remedies under applicable administrative review laws and ordinances, and requests judicial review of this decision under K.S.A. 66-2019(h)(6).

## PRAYER FOR RELIEF

WHEREFORE, AT&T respectfully prays that this Court grant it relief as follows:

1. Permit expedited review of the matters set forth in this Complaint;

2. Enter an order declaring the County's decisions violate and are preempted by 47 U.S.C. § 332(c)(7);

3. Enter an order requiring the County to approve AT&T's Application and authorize AT&T to install its proposed Facility at the Site and to issue all other permits required to install, operate, and maintain the Facility; and

4. Order such other relief as the Court deems appropriate.

Dated:  November 23, 2022

Respectfully submitted,

By:  /s/   Luke G. Maher
     Luke G. Maher (62219MO)
     Norton Rose Fulbright US LLP
     7676 Forsyth Blvd., Suite 2230
     St. Louis, Missouri 63105
     Telephone: (314) 505-8800
     Facsimile: (314) 505-8899
     luke.maher@nortonrosefulbright.com

Attorneys for Plaintiff